IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

GRANT GALLOWAY,                                    )
                    Plaintiff,            )
                                              )
    vs                                             )       Civil Action No. 12-1399
                                              )       Magistrate Judge Mitchell
GEORGE JUNIOR REPUBLIC and GEORGE              )
JUNIOR REPUBLIC IN PENNSYLVANIA,               )
                  Defendants.            )

<u>MEMORANDUM AND ORDER</u>

       Plaintiff, Grant Galloway, brings this action alleging that Defendants, George Junior

Republic ("GJR") and George Junior Republic in Pennsylvania ("GJRPA"), violated the Fair

Labor Standards Act, 29 U.S.C. §§ 201-19 (FLSA), the Pennsylvania Minimum Wage Act, 43

P.S. §§ 333.101-333.115 (PMWA), and the Pennsylvania Wage Payment and Collection Law, 43

P.S. §§ 260.1-260.12 (WPCL) by not compensating him for his sleep time when he was required

to use sleep facilities that were inadequate.

       Presently before the Court for resolution is Defendants' motion for summary judgment.

For the reasons that follow, the motion will be granted.

    <u>Facts</u>

       GJRPA is a private, non-profit residential treatment facility for delinquent and dependent

boys aged eight to eighteen.  It has a 500-acre campus in Grove City, Pennsylvania, which is

home to over 500 youths.  GJRPA offers residential living facilities for its youths, fully-

accredited educational programs, a wide variety of therapeutic activities, and continuing care.

Presently, GJRPA employs approximately 700 individuals in Grove City.

       GJRPA operates roughly 50 cottages and homes for the youths, who live on campus

during the school semester. (Galloway Dep. at 35.)[1] Counselor/Parents (a husband and wife team) live in each cottage or home and supervise the youths assigned to that cottage or home during the week. (Galloway Dep. at 10-11.) Every other weekend, the Counselor/Parents are relieved of their duties by Counselor/Parent Assistants, or Relief Counselor/Parents, as they are sometimes called. (Galloway Dep. at 19, 24.) The Counselor/Parent Assistant assumes responsibility for the youths and remains on-duty for a 52-hour time period. (ECF No. 37 Ex. B ¶¶ 3-4, Ex. L ¶¶ 3-4.) In other words, they are required to stay on-campus during their 52-hour on-duty periods. (ECF No. 37 Ex. B ¶ 5, Ex. L ¶ 6.)

During that 52-hour time period, the Counselor/Parent Assistants are provided two 8-hour sleep periods, for which they are not paid. (Galloway Dep. at 28-29; ECF No. 37 Ex. L ¶ 6.) They are paid for the other 36 hours in the 52-hour on-duty period. (ECF No. 37 Ex. L ¶ 5.) During the 8-hour sleep periods, Counselor/Parent Assistants are completely relieved of duties— paid Night Staff are assigned to the cottages during the sleep periods and are responsible for supervising the youths. (Galloway Dep. at 28-29; ECF No. 37 L ¶10.)

Grant Galloway is a current employee of GJRPA who, for the time period from April 2002 through November 2011, worked as a Counselor/Parent Assistant for GJRPA. (Galloway Dep. at 18, 38.) As a Counselor/Parent Assistant, he was responsible for implementing the behavior modification program for the youth residents, ensuring that the cottages were clean, and making sure the youths made required appointments and hearings. (Galloway Dep. at 20-22.) Galloway supervised 8-10 youths, depending on his cottage assignment. (Galloway Dep. at 22-23.)

During that time, he primarily worked at two cottages: Cottage Z and Alcoa. (Galloway

---

[1] Defs.' App. (ECF No. 37) Ex. A.

Dep. at 22, 25.) Galloway signed a Counselor/Parent Assistant Agreement dated April 29, 2002, which provided in relevant part that: (a) he "shall work one of two shifts during each workweek, i.e., either Thursday 10:30 a.m. to 2:30 p.m., Saturday, or Saturday 1:30 p.m. to 5:30 p.m. Monday"; (b) during his shift, he "shall work a maximum of thirty-six (36) hours"; (c) his weekly salary is "full compensation for the thirty-six (36) hours worked in his … weekly shift"; and (d) if he works in excess of 36 hours per week as a Counselor/Parent Assistant, he shall be paid straight time for additional hours up to 40 hours per week, and time-and-one-half for hours worked in excess of 40 hours per week. (ECF No. 37 Ex. B ¶¶ 4, 5, 6, 7.) While employed as a Counselor/Parent Assistant, Galloway was assigned the 52-hour on-duty periods described in the Counselor/Parent Assistant Agreement, during which he was provided two unpaid 8-hour sleep periods. (Galloway Dep. at 23, 27-28.)

GJRPA provided Galloway with sleeping quarters in the cottages where he worked, e.g., Cottage Z and Alcoa. (Galloway Dep. at 22, 24.) During his sleep periods, Galloway did not have any work responsibilities and never worked. (Galloway Dep. at 29, 97.) The "night person" (officially, Evening Child Care Worker) was responsible for supervising the youths during those sleep periods and stayed in the cottage. (Galloway Dep. at 29.) Galloway, like other Counselor/Parent Assistants, was required to spend his overnight sleeping periods on campus. (Jones Dep. at 9.)[2]

To that end, GJRPA provided "relief rooms" in each of the cottages where Counselor/Parent Assistants were assigned. (Galloway Dep. at 24; Jones Dep. at 10.) Defendants state that the relief rooms were private bedrooms (e.g., each had a door which could be closed and locked) with attached private bathrooms. (Galloway Dep. at 24, 76.) Plaintiff

---

[2] ECF No. 37 Ex. C.

responds that, although the rooms had a door that could be closed and locked, the relief rooms in Cottage Z and Alcoa were used as a common storage area for junk, youths' clothing and winter jackets, youths' shoes and boots, youths' suitcases, bags of youths' clothing, youths' point card boxes, youths' commissary boxes containing candy and hygiene items and holiday items such as the Christmas trees, and that the attached bathroom in Cottage Z was shared with a GJRPA social worker's office.  (Galloway Dep. at 55-57, 60, 66-69, 72-73, 87-88, 90, 92, 101-102.)

The bedrooms were furnished with beds, couches, chairs, dressers and so forth. The bathrooms featured toilets, sinks and a shower. (Galloway Dep. at 45-47, 54-57; ECF No. 37 Ex. K, Ex. L ¶ 9.)  While employed as a Counselor/Parent Assistant, Galloway primarily worked in Cottage Z and Alcoa, alternating weekends.  (Galloway Dep. at 25, 42.)  Both Cottage Z and Alcoa had private sleeping facilities with an attached bathroom.  Cottage Z was a ranch-style home. The relief room was in the center of the home, off of the living room and the kitchen. (Galloway Dep. at 53-54; ECF No. 37 Ex. J.)  The Counselor/Parent apartment was to the left, and the youth bedrooms and bathrooms to the right.  (ECF No. 37 Ex. J.)

Cottage Z's relief room was furnished with a full-sized bed, a dresser and mirror, a reclining chair, a night stand and desk lamp, bookcase and file cabinet. (Galloway Dep. at 55-56; ECF No. 37 Ex. K.)  The bedroom was carpeted.  (Galloway Dep. at 57.)  The tiled bathroom had a toilet, sink and vanity, and a shower, and connected through a door to the social worker's office off of the sun room.  (Galloway Dep. at 54-55.)  Cottage Z had central heating and a ceiling fan in the hallway in the youth residents' part of the home, but it did not have central air conditioning (indeed, none of the regular cottages had air conditioning) and there was no ceiling fan in the relief room.  (Galloway Dep. at 58-59.)  Because the relief room in Cottage Z was an interior room, it did not have a window.  (Galloway Dep. at 55.)

Alcoa (which has since been replaced by a special needs unit, Galloway Dep. at 22) was also a ranch-style home with a living room, a kitchen, a sun room and the apartment for the Counselor/Parents at that cottage. To the left, down the hallway, were the boys' rooms, on both sides of the hallways. At the end of that hall was the relief room, which had a door and an attached bathroom. (Galloway Dep. at 42-43.) The bathroom, which had a shower, toilet and sink and vanity, was tiled. (Galloway Dep. at 45, 57.) Alcoa also had a door which provided direct access outside the cottage. (Galloway Dep. at 44.) The Alcoa relief room, which was carpeted, had a Queen bed and a couch. (Galloway Dep. at 46-47, 55, 57.) Like Cottage Z, Alcoa had central heating and a ceiling fan in the hallway in the youth residents' part of the home, but no central air conditioning and no ceiling fan in the relief room. (Galloway Dep. at 58-59.) The relief room had a window. (Galloway Dep. at 48.)

The only people that used the relief room were the Counselor/Parent Assistants. (Galloway Dep. at 48-49.) Defendants state that these individuals were principally responsible for maintaining the relief room, although the Counselor/Parents and the youth residents also aided in cleaning the room. (Galloway Dep. at 49-50; McCamey Dep. at 23-24.[3]) Plaintiff responds that in addition to the Counselor/Parents, Counselor/Parent Assistants and the youth residents cleaning the relief rooms, it is the responsibility of the facility manager and maintenance men for GJRPA to oversee of all buildings, grounds and utilities, and to regulate the temperature in the relief rooms, as the Counselor/Parents and Counselor/Parent Assistants could not adjust the temperature themselves. (Clark Dep. at 8, 21-24.)[4] Additionally, GJRPA personnel would need to be summoned if the battery in the switch was going dead and emitting

---

[3] ECF No. 37 Ex. D.
[4] ECF No. 37 Ex. I.

an alarm.  (Dick Dep. at 22-23.)[5]

Defendants state that the plans for each cottage were approved by the Commonwealth of Pennsylvania, and yearly inspections certify that the cottages are up to code and meet Department of Welfare requirements.  (Jones Dep. at 21-22; Morris Dep. at 28-29.[6])  Plaintiff responds that the record does not contain these plans or inspection reports, and therefore, he is unable to determine the authenticity of the alleged reports, the relevance of those reports, whether the reports address the conditions of Alcoa and/or Cottage Z, and whether the reports are relevant to or address any concerns he has raised about his complaints regarding Alcoa and Cottage Z.  Furthermore, he notes that these reports were never disclosed by Defendants in their Rule 26 Disclosures, nor were they made available to him after being requested subsequent to the depositions cited to by Defendants.  (ECF No. 39 ¶ 37.)

Galloway's alleged concerns about clutter and shoes in the cottages did not affect his ability to sleep. (Galloway Dep. at 100-01.)  Galloway asked the Counselor/Parents in the cottages to organize the clutter, which they did to the best of their ability. (Galloway Dep. at 67-68.)  Plaintiff denies that the clutter was removed from the rooms because there was no place else to place the items.  (Galloway Dep. at 67-68.)

Defendants contend that Galloway has lived in a variety of non-air conditioned residences, including his college dormitory in Philadelphia. (Galloway Dep. at 41, 77-78.) Plaintiff responds that four of his previous residences had either central air conditioning or a window unit air conditioner.  He admits that two of his previous residences, including his college dormitory in Philadelphia, did not have air conditioning.  However, Plaintiff argues that, to the extent Defendants have attempted to analogize his previous residences with the relief room in

---

[5] ECF No. 37 Ex. F.
[6] ECF No. 37 Ex. H.

Cottage Z, such attempt is misleading.  One of these prior residences was shaded by a large tree.  Furthermore, the relief room in Cottage Z lacked a window, and the record does not establish that either of his non-air conditioned prior residences had no windows.  (Galloway Dep. at 41, 77-78.)

Defendants note that Galloway always brought a fan with him to Cottage Z to provide cooling and move the air, and he acknowledges that he could have also requisitioned a fan from the on-site warehouse.  (Galloway Dep. at 57-58.)  Plaintiff responds that he testified that the youth residents had box fans and he speculated, when asked, that he "probably could have petitioned the warehouse" for a box fan.  Additionally, he acknowledged that he brought a fan with him to "get air moving" and for "noise," but never stated that the fan provided cooling.  In fact, when he tried to put a fan in the doorway of the bathroom of Cottage Z to blow cooler air, it did not work.  (Galloway Dep. at 57-60.)

The temperature (that is, the heat) in Cottage Z could be adjusted for comfort in the winter months.  The temperature in the cottages is regulated with on-the-wall thermostats. The base temperature is 68 degrees Fahrenheit.  While the thermostats in the cottages cannot be adjusted by the Counselor/Parents, the Counselor/Parent Assistants or the youth residents, they can request maintenance, or the unit directors, or the Facilities Director to adjust the thermostat. In fact, GJRPA's Facilities Director testified that he receives hundreds of requests per year to adjust the thermostat settings in the many cottages on campus.  When such a request is received, GJRPA regulates the temperature up or down in the cottage to suit individual comfort, and in the case of Cottage Z, each room is roughly the same temperature.  (Clark Dep. at 21-23.)

Plaintiff notes that there was no ability to separately regulate the temperature in the relief room in Cottage Z, and rooms in Cottage Z were not roughly the same temperature because the

relief room was a lot hotter than the living room in Cottage Z. (Galloway Dep. at 74, 80-81.)

Plaintiff testified that on "hot days" he was usually asleep by midnight. (Galloway Dep. at 76.) Defendant notes that this means that he obtained six hours of sleep during each sleep period. (Galloway Dep. at 76.) Plaintiff contends that he never testified that he got six of hours of uninterrupted sleep during each sleep period. However, this conclusion follows inexorably from the evidence: based on his schedule, his sleep periods were from 10:00 p.m. on Thursday and Friday nights until 6:00 a.m. the next morning. (Galloway Dep. at 28.) Thus, if he was "asleep by midnight" (Galloway Dep. at 76), then he would have received approximately six hours of sleep. He did not testify to the contrary.

In the relief rooms in Cottage Z and Alcoa was an "electronic switch." The switches were installed in the cottages a number of years ago in connection with surveillance equipment, and were installed after the death of a night staff employee on campus. (Galloway Dep. at 65; Jones Dep. at 17.) Electronic data moves through the switches and is placed on a fiber optic cable. (Morris Dep. at 19-20.) The switches are on metal shelving attached to a wall in the relief room, and look something like a desktop computer tower. (Galloway Dep. at 46-47.) GJR employees said the electronic switch sounds like a low "purr" or "hum," similar to the fan on a laptop computer that one quickly ceased to notice. (Jones Dep. at 18; McCamey Dep. at 21; Miller Dep. at 20[7]; Dick Dep. at 24; Morris Dep. at 20, 27.) Galloway masked any noise from the switch by using a fan. (Galloway Dep. at 65-66.)

Plaintiff responds that he testified that the electronic switch made a loud, continuous buzzing noise. (Galloway Dep. at 62.) He also denies testifying that "any" noise from the switch could be masked by using a fan. Rather, he was only referring to masking the buzzing noise

---

[7] ECF No. 37 Ex. E.

from the switch with his fan, and not the additional beeping sound that the switches in the relief rooms emitted when the batteries in them began to run low. (Galloway Dep. at 52-53, 82.)

However, Defendants note that the intermittent beeping sounds were made when the electronic switch's batteries were low and that Plaintiff testified that the beeping occurred "[p]robably three or four times a year." (Galloway Dep. at 82.) Such a problem would be addressed "right away," unless there was a higher priority call, in which case the maximum wait for service would be an hour. (Miller Dep. at 26.)

There was a wall-mounted phone in Cottage Z on the outside of one of the relief room walls, above the head of the bed. (Galloway Dep. at 60.) The phone only connects to the receptionist on campus and cannot be used for other purposes. (Morris Dep. at 23-24.) Overnight, the phone is used every half-hour by the assigned Night Staff. The night staff employee at Cottage Z (and every other regular cottage) is required to call the receptionist and advise whether all the youths are accounted for. There is no conversation: the night relief employee picks up the phone, says the cottage is OK, and then hangs it up. (Galloway Dep. at 30-31; Jones Dep. at 24-25; Morris Dep. at 23-24.) The phone should not be ringing overnight with incoming calls. (Jones Dep. at 14; Miller Dep. at 15-16.)

Plaintiff responds that, although the Night Staff will usually just call down and say the cottage is okay, usually for the first time calling the Night Staff will make sure that their count is the same count that is on the books. Additionally, if there is a problem, the Night Staff will have to call the receptionist, who would call the campus supervisor. (Galloway Dep. at 30-32.) He also notes that his sleep was interrupted by the phone because every half hour he could hear the Night Supervisor pick up the phone, talk on the phone, and set it down, and the sounds came right through the wall. (Galloway Dep. at 61.)

Galloway had never complained about the telephone before the litigation.  (Galloway Dep. at 90-91.)  Defendants note that Galloway only complained "years ago" to maintenance about the noise from the electric switch.  (Galloway Dep. at 89-91.)  Plaintiff responds that he was told that there was nothing that could be done because there was nowhere else to install the switches. (Galloway Dep. at 89-91.)

Defendants state that Galloway never complained to the Unit Supervisors, whom he considered his supervisors.  (Galloway Dep. at 33-34.)  Plaintiff responds that one of his Unit Directors was Mike McCann and that he complained to McCann about the smell in the relief room, and McCann told him just to "get it sprayed out."  (Galloway Dep. at 33-34, 90.)

Galloway concedes that he never complained to the Campus Supervisors, whom he said he would contact, through the receptionist, if there were problems during his shift.  (Galloway Dep. at 32-33; Miller Dep. at 12-15, 18-19, 22; Dick Dep. at 13-14, 20, 25-26.)  He never complained to GJRPA's Vice-President of Human Resources.  (Jones Dep. at 7, 11-17, 19-20, 23-24.)  He never complained to GJRPA's Chief Operating Officer. (Morris Dep. at 8, 15-18, 20-22, 24-27.)  He never complained to GJR's Facilities Director.  (Clark Dep. at 18-20.)  He never complained to the person who scheduled him at Cottage Z and/or Alcoa.  (Greggs Dep. at 16-20, 22-23, 28.)[8]  See ECF No. 39 ¶¶ 57-61.

Neither did other employees complain.  (Jones Dep. at 11-17, 19-20, 23-24; Miller Dep. at 12-15, 18-19, 22; Dick Dep. at 13-14, 20, 25-26; Greggs Dep. at 16-20, 22-23; Morris Dep. at 15-18, 20-22, 24-27; Clark Dep. at 18-20.)  Defendants have submitted 26 declarations by Counselor/Parent Assistants, 11 of whom slept at Cottage Z, who state that they were rarely disturbed and that they were able to enjoy uninterrupted sleep.  (ECF No. 37 Ex. L ¶ 12; Greggs

---

[8] ECF No. 37 Ex. G.

Decl. ¶ 6[9].)

Plaintiff responds that other Counselor/Parent Assistants complained to him about the sound emitted by the electronic switch. (Galloway Dep. at 63.) He has also submitted a declaration by Counselor Parent Cindy Wolf, who "was able to observe the living conditions of the relief room within 'Cottage Z'" and who echoes his four complaints about the relief room in Cottage Z. (Wolf Decl. ¶¶ 1-6.)[10] However, she has not actually stated that she slept in the relief room in Cottage Z and she does not indicate that she ever complained to anyone, especially a supervisor, about these issues.

Galloway had previously been a Counselor/Parent at GJRPA from 1984 to 1995 and lived on campus. (Galloway Dep. at 9-11.) Upon returning to GJRPA, Galloway lived for some time in Indiana and Ohio while working for GJRPA as a Counselor/Parent Assistant, commuting from those states to his job in Grove City. (Galloway Dep. at 7, 26.) During some of that time period, he also worked at an Indiana group home operated by a GJR subsidiary for one weekend, and then worked another weekend in Grove City at Cottage Z. (Galloway Dep. at 26.) Although GJRPA asked Galloway to work both weekends in Indiana (Galloway Dep. at 85), thereby eliminating the commute to Grove City, Galloway preferred to work at Cottage Z. (Galloway Dep. at 27-28.) Plaintiff responds that he never requested to work in Cottage Z, nor did he indicate a preference to work in Cottage Z; rather, Cottage Z was his cottage based upon the assigned schedule. His reasons for declining to work both weekends in Indiana were that: (1) he wanted to maintain consistency for the boys in Cottage Z, (2) he liked the Cottage Parents in Cottage Z, (3) he wanted to maintain work in Pennsylvania in case he had to move back, and (4) so that he could maintain visitation with his son who was in Ohio. Plaintiff argues that

---

[9] ECF No. 41 Ex. 1.
[10] Pl.'s App. (ECF No. 40) Ex. B.

Defendants have misrepresented his stated reasons for maintaining his weekends in Pennsylvania as his indication that the conditions in the relief room in Cottage Z were satisfactory. (Galloway Dep. at 27, 85-86.)

Defendants note that he never complained about Cottage Z to the scheduler or asked to be removed from Cottage Z, and seemed to like working at Cottage Z because of his relationship with the Counselor/Parents assigned to that cottage. (Greggs Dep. at 28-29.) Plaintiff responds that, although he did enjoy his relationship with the Counselor/Parents assigned to Cottage Z, he did ask to be removed from Cottage Z in November 2011 when he requested, and was granted, a transfer from Cottage Z to Special Needs 3. (Galloway Dep. at 38-39, 85.) Defendants also note that Plaintiff had previously requested and received permission to move from Cottage F to Alcoa. (Galloway Dep. at 83-84.)

In one instance, a cottage Galloway was assigned to (Henderson) had mold in the bathroom. Galloway logically called Don Dick, who worked as a Campus Supervisor, to report the problem and Dick told him that he should not stay in that cottage and arranged for him to stay at an apartment on campus. (Galloway Dep. at 51-52; Dick Dep. at 30-31.)

Galloway had a sleep study done because his wife had complained about his snoring. The study revealed that he only slept five hours a night and had sleep apnea. (Galloway Dep. at 102.) His treatments did not work. (Galloway Dep. at 103.) Presently, Galloway brings a fan with him everywhere he goes to aid in his sleep. (Galloway Dep. at 57-58, 61, 65.)

Plaintiff denies this statement to the extent that Defendants assert that the sleep study in 2005 is relevant to the habitability of the relief rooms in Alcoa or Cottage Z or in any way contributed to his inability to get uninterrupted sleep in Alcoa or Cottage Z. Plaintiff maintains that his sleep was interrupted by the heat, noise, smell and clutter in the relief rooms. (Galloway

Dep. at 60.)

Plaintiff states that he complained to GJRPA employee Janie McCamey at least three or four times about the heat in the winter and the clutter in the relief room in Cottage Z. (Galloway Dep. at 88-89.) Defendants note that McCamey testified that Plaintiff never complained to him. (McCamey Dep. at 11-16, 21-22.) It is also noted that McCamey was a "housekeeping consultant" (McCamey Dep. at 7) or as Galloway described her, "the decorator" (Galloway Dep. at 88), and not a supervisor.

Plaintiff states that the relief room in Cottage Z smelled like shoes. (Galloway Dep. at 60.) Defendant responds that Plaintiff conceded that the room did not smell like shoes all the time. (Galloway Dep. at 72.) And, as noted, he admitted that his complaints about clutter and shoes did not affect his ability to sleep. (Galloway Dep. at 100.)

Plaintiff contends that the relief room within Cottage Z was inadequate for enjoying uninterrupted sleep and/or not being disturbed because the relief room was excessively hot (well in excess of eighty-six (86) degrees) during the nighttime hours during the summer months due to the fact that the sleeping facility had no air conditioning or window for ventilation, as well as during the remaining months of the year when the heating system was on in Cottage Z. (Galloway Decl. ¶ 8;[11] Wolf Decl. ¶ 6.)

Defendants respond that the room was not excessively hot during the nighttime hours during the summer months. Rather, Galloway testified that on one summer day, he noticed that the thermometer in the living room read 86 degrees Fahrenheit, so he surmised (because there was no thermometer in the relief room) that his sleeping quarters were at least as hot or hotter. (Galloway Dep. at 74, 80-81.) But he also testified that "there were times periodically when it

---

[11] ECF No. 40 Ex. A.

was relatively decent in there. It's just hard to explain." (Galloway Dep. at 92.)

Plaintiff states that the relief room within Alcoa was inadequate for enjoying uninterrupted sleep and/or not being disturbed because: 1) the relief room contained electronic surveillance equipment which emitting a constant, audible buzzing noise, as well as other intermittent beeping sounds; and 2) the relief room was used as a common storage location for George Junior's and its youth residents' personal items. (Galloway Decl. ¶ 9.) Defendants deny this assertion for the reasons cited above.

Finally, Plaintiff states that, as a Counselor/Parent Assistant at GJRPA, he never received a salary or compensation during any of the two (2) periods of eight (8) hours of sleep time when he was unable to enjoy uninterrupted sleep and/or not be disturbed as a result of the relief room conditions within Cottage Z or Alcoa that made these rooms inadequate for enjoying uninterrupted sleep and/or not being disturbed. (Galloway Decl. ¶ 10.) Defendants respond that Plaintiff indicated he was always able to enjoy uninterrupted sleep despite his current complaints about the sleeping facilities. (Galloway Dep. at 65-66, 76, 100-02.)

Procedural History

Plaintiff filed this action on behalf of himself and all others similarly situated on September 26, 2012 (ECF No. 1) and on March 27, 2013, he filed an Amended Complaint, which removed the collective and class action allegations (ECF No. 20). Subject matter jurisdiction is based on the federal question presented by the FLSA claim in Count I, 29 U.S.C. § 216(b); 28 U.S.C. § 1331, and supplemental jurisdiction covers the PMWA and WPCL state law claims in Count II, 28 U.S.C. § 1367. On May 3, 2013, the parties filed a joint consent to trial/jurisdiction to United States Magistrate Judge (ECF No. 30) and on May 6, 2013, the case was assigned to the undersigned. On July 31, 2013, Defendant filed a motion for summary

judgment (ECF No. 34). Plaintiff filed his brief in opposition on August 15, 2013 (ECF No. 38),

Defendant filed a reply brief on August 29, 2013 (ECF No. 41), and Plaintiff filed a sur-reply

brief on August 30, 2013 (ECF No. 43).

Standard of Review

As amended effective December 1, 2010, the Federal Rules of Civil Procedure provide

that: "The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed.R.Civ.P. 56(a). Summary judgment may be granted against a party who fails to adduce facts

sufficient to establish the existence of any element essential to that party's case, and for which

that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322

(1986). The moving party bears the initial burden of identifying evidence which demonstrates

the absence of a genuine issue of material fact. Once that burden has been met, the non moving

party must set forth "specific facts showing that there is a genuine issue for trial" or the factual

record will be taken as presented by the moving party and judgment will be entered as a matter

of law. Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). An

issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In following this directive, a court must take the facts in the light most favorable to the

non-moving party, and must draw all reasonable inferences and resolve all doubts in that party's

favor. Hugh v. Butler County Family YMCA, 418 F.3d 265, 266 (3d Cir. 2005); Doe v. County

of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001).

Defendant argues that: 1) the sleeping facilities are adequate; 2) Plaintiff's complaints are

specious because he admitted that the minor annoyances he cites did not prevent him from

15

sleeping, especially when he used his fan to cool the room down and mask any noise, because he has documented sleep apnea which is the real reason he could not sleep, because he rarely complained about these issues and almost never complained to a supervisor and because he could have requested a different assignment but he did not do so; and 3) Plaintiff cannot maintain a claim under the WPCL as it applies only when an employer breaches a contractual remedy to pay earned wages and his contract explicitly excluded sleep time from his wages. In the alternative, Defendants note that, although GJRPA is Plaintiff's employer, GJR, the parent company, is not unless Plaintiff demonstrates that it is his joint employer which he has not done, so GJR should be dismissed in any event.

Plaintiff responds that: 1) the two relief room were inadequate as a matter of law, whether they are compared to the average college dormitory or not; 2) he did complain, as did other Counselor/Parent Assistants, but there was no improvement in the conditions; 3) he did not ask to be assigned to Cottage Z, but was assigned to it based on the schedule and his reasons for remaining in Pennsylvania rather than working weekends in Indiana were not based on a preference for Cottage Z, and in fact he asked to be removed from it in 2011 and was granted a transfer; and 4) the declarations submitted by Defendants to demonstrate that no other employees were dissatisfied with the conditions of the relief rooms do not show that any of these individuals worked in Cottage Z or Alcoa.

In a reply brief, Defendants argue that: 1) despite the four complaints Plaintiff raises, his own testimony establishes that these minor inconveniences did not prevent him from getting an uninterrupted night of sleep; 2) although he occasionally complained, he did not raise the issues with the Unit Directors, whom he considered his supervisors, or with the Campus Supervisors, whom he said he would contact, through the receptionist, if there were problems during his shift,

or with GJRPA's Vice-President of Human Resources, or with its Chief Operating Officer, or with GJR's Facilities Director, or the scheduler; 3) contrary to Plaintiff's contention, other Counselor/Parent Assistants did work at Cottage Z and sleep there, and at least eleven of the declarants stated they had no complaints about it; 4) Plaintiff never requested to be moved from Cottage Z until November 2011 when his request was granted, and he previously had requested to move from Cottage F to Alcoa and his request was granted; and 5) Plaintiff has not addressed their arguments that the WPCL claim should be dismissed or that he cannot maintain a claim against GJR.

In a sur-reply brief, Plaintiff argues that Defendants are incorrect that he could never enforce a collection action under the WPCL for sleep time even if the Court concludes that he should be paid for this time. Nevertheless, he acknowledges that his WPCL claim is dependent upon his wage claims.

<u>FLSA Actions</u>

The FLSA generally requires that employers pay all non-exempt employees for all hours worked. 29 U.S.C. §§ 206-07. An employee who is not paid appropriately may bring suit under the FLSA. 29 U.S.C. § 216(b).

The issue in this case is whether Plaintiff should have been paid for any or all of his two 8-hour sleep periods during each of his on-duty periods while employed as a Counselor/Parent Assistant. The parties agree that the relevant regulation is the following:

> (a) General. Where an employee is required to be on duty for 24 hours or more, the employer and the employee may agree to exclude bona fide meal periods and a bona fide regularly scheduled sleeping period of not more than 8 hours from hours worked, provided adequate sleeping facilities are furnished by the employer and the employee can usually enjoy an uninterrupted night's sleep. If sleeping period is of more than 8 hours, only 8 hours will be credited. Where no expressed or implied agreement to the contrary is present, the 8 hours of sleeping time and lunch periods constitute hours worked.

17

(b) Interruptions of sleep. If the sleeping period is interrupted by a call to duty, the interruption must be counted as hours worked. If the period is interrupted to such an extent that the employee cannot get a reasonable night's sleep, the entire period must be counted. For enforcement purposes, the Divisions have adopted the rule that if the employee cannot get at least 5 hours' sleep during the scheduled period the entire time is working time.

29 C.F.R. § 785.22 (case citations omitted).[12]  The Pennsylvania Department of Labor and Industry has indicated that, for purposes of the PMWA, it has generally followed the federal regulations, including § 785.22.  (ECF No. 35 Ex. 1.)  Moreover, Pennsylvania courts have looked to the FLSA for guidance in applying the PMWA.  See Commonwealth of Pa. Dep't of Labor & Indus., Bureau of Labor Law Compliance v. Stuber, 822 A.2d 870, 873 (Pa. Commw. 2003), aff'd mem., 859 A.2d 1253 (Pa. 2004).  Thus, the analysis for the FLSA and PMWA claims is the same.

In Hultgren v. County of Lancaster, 913 F.2d 498 (8th Cir. 1990), employees of the Lancaster County [Nebraska] Office of Mental Retardation (LOMAR) known as human service instruction assistants (HSIAs) took the place of residential managers one to two days a week at numerous residential facilities for mental impaired individuals.  An HSIA assigned to a typical "relief" shift would report to a facility at 2:45 p.m. and remain on the premises until 8:30 a.m. the next day, with eight hours of the shift (11:00 p.m. to 7:00 a.m.) designated as "sleep time." The court described their conditions as follows:

> Unlike the resident managers, who were hired to care for residents at one

---

[12] Section 785.22 is an "interpretive rule" which does not have the force of law but is entitled to some level of deference, either "substantial deference" under Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), or as a substantial resource of agency expertise "to which courts and litigants may properly resort for guidance" under Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944).  The parties have not addressed this issue or challenged the agency's interpretation and thus this case turns on how the section applies to Plaintiff's situation.  See Shannon v. Pleasant Valley Community Living Arrangements, Inc., 82 F. Supp. 2d 426, 429-30 (W.D. Pa. 2000).

facility, HSIAs moved from facility to facility. Accordingly, they "did not have the luxury of knowing the clients as well or having the clients become comfortable with their presence." They also had to adapt to the different sleeping accommodations provided at each facility. In some places, the HSIAs were required to sleep on a couch or a hide-a-bed in the living room. Other facilities had staff bedrooms, which normally were used by the residential managers. Relief employees often slept in the living room even when a separate staff bedroom was available, because of the behavior patterns of the residents and/or the condition of the particular staff bedroom.

Regardless of where they spent their "sleep time," the relief employee's job was "to sleep with one eye and one ear open" to ensure the safety and well-being of the residents. Residents at each facility displayed a variety of behaviors which resulted in numerous interruptions during the nighttime hours. This behavior included attempts to escape or leave the facility, displaying aggressive and self-abusive behaviors, taking frequent loud and disruptive trips to the bathroom and kitchen, urinating in inappropriate places, talking in their sleep, turning on the stereo, being afraid of thunderstorms, attacking other residents, throwing tantrums, having itching attacks, waking up and wandering around, watching the television (which in at least one facility was in the same room where the relief employee was supposed to sleep), asking for cigarettes, and having delusions or coughing attacks.

The frequency and duration of interruptions varied from facility to facility and from night to night, but plaintiffs testified, and the magistrate found, that the interruptions were so numerous that it was impossible for plaintiffs to get even several hours of uninterrupted sleep. Plaintiffs testified they usually went home to sleep after their relief shift ended.

Id. at 500. After a trial, the district court found in favor of the plaintiffs. The court of appeals concluded that:

The record amply supports the magistrate's finding that plaintiffs rarely were able to obtain a full night's sleep while on duty at LOMAR's facilities. It is undisputed that the clients at each facility displayed behaviors which required the attention of staff during the night, and although plaintiffs were compensated when called to duty for ten minutes or more, they were only compensated for such documented calls to duty. The record reflects that plaintiffs' duties frequently included other tasks at night which precluded them from sleeping but which did not require a documented "call to duty."

Id. at 505 (footnote omitted). The court found that LOMAR was manipulating the data by claiming that the HSIAs were "on call" during their "off duty" hours, such that they were

actually working shifts less than 24 hours long and therefore § 785.21 (pursuant to which an

employee on duty for 24 hours or less is deemed to be "working" for the entire time even if

permitted to sleep for part of it) actually applied.  The court continued by stating that:

> Even assuming section 785.22 of the regulations applies, both this
> regulation and the opinion letters from the Wage & Hour Deputy Administrator
> are premised on the notion that employees are able to get a full night's sleep and
> are provided with adequate sleeping facilities or a home-like environment in a
> group home setting. The sleeping accommodations for plaintiffs in this case, who
> were generally in a different group home each night they worked and who often
> slept on a sofa or hide-a-bed in the living room, are simply not the same as the
> environment envisioned by the opinion letters. Moreover, plaintiffs did not
> usually enjoy an uninterrupted night's sleep, both because of [the] nature of their
> sleeping accommodations and because, as a general rule, the clients who resided
> in LOMAR's facilities were "prone to being up at night, often frequently, and on
> a consistent basis over time." Thus, "the very nature of plaintiffs' jobs required
> that they be ready for frequent nighttime interruptions."

Id. at 506.

In Braziel v. Tobosa Developmental Services, 166 F.3d 1061 (10th Cir. 1999), residential

assistants in homes for developmentally disabled people brought suit, claiming that their sleep

time should have been compensated.  Tobosa had a policy of paying for any time employees

were disturbed during the night, if the disturbance was reported.  The plaintiffs contended that

Tobosa did not always follow this policy and that they regularly got less than five hours of sleep

during the scheduled sleep time, but they admitted that they often did not report disturbances and

that they were paid for the disturbances they did report.  The district court concluded that there

was an implied agreement to exempt sleep time from paid work and entered summary judgment

in the defendant's favor.  The court of appeals agreed.  The court distinguished Hultgren, noting

that in that case:

> employees were not given separate sleeping facilities and nightly interruptions
> were so numerous that the employees could not get even several hours of sleep.
> The employer's sleep time policy prohibited reporting interruptions lasting less
> than ten minutes and provided that the entire sleep time period would not be paid

for unless interruptions totaled three hours or more.

Id. at 1063-64 (citations omitted).  See also Hendricks v. Oklahoma Production Ctr. Grp. Homes, Inc., 2005 WL 3486008, at *2 (10th Cir. Dec. 21, 2005) (when plaintiffs understood when they were hired that sleep time was not compensable, they were paid for interruptions in their sleep and were paid for the entire period if their duties prevented them from getting at least five hours' sleep, agreement was within regulation and was enforceable, so summary judgment was entered in defendant's favor); Bouchard v. Regional Governing Bd. of Region V Mental Retardation Servs., 939 F.2d 1323, 1328-33 (8th Cir. 1991) (Life Skill Trainers at group homes who were provided private sleeping rooms, compensated for recorded sleep time interruptions and paid for any eight-hour sleep period in which client interruptions totaled 3 hours or more had adequate sleeping facilities and employment agreements excluding sleep time were enforceable); Sidell v. Residential CRF, Inc., 2010 WL 4723722, at *6-7 (S.D. Ind. Nov. 12, 2010) (evidence demonstrated that staff room was separate and provided a private place to sleep and the plaintiff never complained about it, so summary judgment entered in defendant's favor).

In Beaston v. Scotland School for Veterans' Children, 693 F. Supp. 234 (M.D. Pa. 1988), aff'd mem., 869 F.2d 587 (3d Cir. 1989), houseparents at a private school who were required to spend their sleep time on campus during their seven-day shifts contended that their facilities were inadequate.  After a trial, the court made the following findings concerning the facilities:

> During the seven day work shift the plaintiffs spend their on-duty time and sleep time in their respective cottages. Each cottage is furnished and has a living room, dining area, kitchen, bathroom and playroom or office on the first floor, and the children's bedrooms, houseparent's bedroom and bathroom, and an additional bathroom on the second floor. The plaintiffs sleep in their private bedrooms and utilize private bathrooms. They are authorized to furnish their rooms as they wish, may have personal telephones installed and may bring in articles of personal property and food. They have access to the cottage's kitchen which is equipped with the normal assortment of appliances. They also may use the cottage living room to watch television or relax in other manners. The

houseparents may, if they wish, remain on campus continuously during their duty week. They may receive visitors when the children are in school and for one-half hour on Saturdays and Sundays.

The plaintiffs contend that the sleeping facilities provided by the school are inadequate in that they are unable to obtain normal rest during the uncompensated periods of sleeping time. Complaints at trial concerned noises from students, the heating system, passing trains and security guards. Depending upon the cottage, its location on the campus and the sleeping habits of the individual houseparents, the intrusiveness of the disturbances varied. Some houseparents didn't hear noises. Of the plaintiffs who were disturbed by noises, some testified they would remain awake for long periods while others went back to sleep immediately.

The variations in testimony reveal the personal factors involved in an inquiry into the adequacy of sleeping facilities. There is no doubt that the houseparents' sleep is temporarily disturbed on occasion. However, upon consideration of all of the evidence, the court is unable to conclude that the plaintiffs are furnished inadequate sleeping facilities or that they are unable to get normal rest. The noises they complain of are not unlike those in many homes in many communities. The court puts substantial weight on the fact that the Scotland School Administration has received few complaints about nighttime interruptions. Furthermore, when alerted about noise, the school attempts to correct the problem.

Id. at 238-39. The court concluded that the facilities were adequate and that the compensation agreements excluding sleep time were enforceable. See also Roy v. County of Lexington, S.C., 141 F.3d 533, 546 (4th Cir. 1998) (when the majority of EMS personnel enjoyed at least five hours of uninterrupted sleep without a call to duty, court properly found at trial that EMS personnel "usually" obtained an uninterrupted night's sleep for purposes of § 785.22(a) and county could exclude the sleep time from compensable hours); Trocheck v. Pellin Emergency Medical Service, Inc., 61 F. Supp. 2d 685 (N.D. Ohio 1999) (when an ambulance service employee was paid for 20 hours of each 24-hour shift and was paid for all 24 hours if his duties prevented him from obtaining five hours of sleep and usually obtained an uninterrupted night of sleep and he never raised a complaint about the situation, the court concluded that these facts undermined both his attempt to discredit the implied agreement that the parties had entered to

exclude four hours of sleep time from his compensation and his argument that the facilities were inadequate; in addition, the facilities which were equivalent to those enjoyed by the average college dormitory student and were substantially better than those enjoyed by most of the medical residents to whom he delivered patients, and he enjoyed at least five hours of sleep approximately 95% of the time); Shannon, 82 F. Supp. 2d at 432-33 (employees agreed at least by implication to employer's sleep time policy which did not pay them for sleep time unless it was interrupted and if they could not obtain five hours of sleep all eight hours were compensated, but there was a genuine issue of material fact as to whether employer actually abided by this policy when employees testified that they received overtime only if they received less than five hours of sleep and were told not to turn in any other overtime for sleep interruptions).

As summarized above, Plaintiff's complaints that the sleeping facilities in Cottage Z and Alcoa were not "adequate" fall into four categories: 1) the rooms were cluttered and sometimes smelled like shoes; 2) Cottage Z was excessively hot and was an interior room with no effective way to cool it down; 3) certain electronic equipment in both rooms emitted a buzzing noise and intermittent beeping sounds; and 4) there was a telephone on the wall outside of the Cottage Z relief room that disturbed him each time it was used every half-hour to call the receptionist and advise that all youths were accounted for. Defendants contend that these complaints are specious because Plaintiff admitted that these minor annoyances did not prevent him from getting at least six hours of sleep each night, especially when he used his fan to cool the room down and mask the noise, because he has documented sleep apnea which is the real reason he could not sleep, because he rarely complained about these issues and almost never complained to a supervisor, and because he could have requested a different assignment but he did not do so.

Considering Plaintiff's claim in the light of this body of case law, it is apparent that he has failed to demonstrate the existence of a genuine issue of material fact. Unlike the situation in Hultgren, the nature of Plaintiff's job did not require him to be ready for frequent nighttime interruptions (indeed, he was completely relieved of duties) and he has not argued or presented evidence (as did the employees in Shannon) that GJRPA's actual practices differed from the written policy or that he was told not to turn in overtime for sleep interruptions. Thus, this case resembles the vast majority of cases cited above, in which courts concluded that employees regularly obtained at least five hours of sleep, that the employer's policy allowed them to submit requests for overtime if they documented that their sleep was interrupted and to be paid for the entire 8-hour sleep period if they received less than five hours of sleep a night (thereby satisfying § 785.22), and that they did not complain about the adequacy of the sleeping facilities.

Several of Plaintiff's complaints (the "shoe smell" and the buzzing of the equipment) appear to be minor annoyances which did not even affect his ability to sleep. The beeping, which was the result of the electronic switch's batteries running low, occurred three or four times a year and would be addressed right away, unless there was a higher priority call, in which case the maximum wait for service would be an hour. Thus, this complaint does not alter the conclusion that he "usually" obtained an uninterrupted night of sleep.

The telephone and heat at Cottage Z may have interrupted his sleep on occasion, but he appears to have been able to obtain six hours of sleep,[13] he masked the noise and reduced the

---

[13] Plaintiff asserts that he never testified that he received six hours of sleep, but as noted above, if he was allotted an 8-hour period of time in which to sleep and was asleep by midnight, then it follows that he obtained six hours. In any event, Plaintiff did not testify that, on the whole, he was usually able to obtain less than five hours of sleep. On the other hand, he testified that a sleep study showed that he obtained only about five hours of sleep per night because of his sleep apnea. Although this evidence would provide support for the claim that he received five hours of sleep, it would also indicate that the adequacy of the sleeping facilities was not the cause.

heat somewhat with a fan and he did not complain about these disturbances to his supervisors (unlike the situation regarding the mold, when he complained and was immediately moved to an apartment) or ask to be transferred to another facility (although he did request and receive a transfer from Cottage F to Alcoa and in November 2011 he requested and was granted a transfer from Cottage Z). The record also contains significant evidence that no one else experienced problems with these relief rooms and that no one else complained about them. Plaintiff's failure to complain is entitled to "substantial weight" on the issue of whether the facilities were adequate within the meaning of § 785.22 and would be relevant to the issue of whether there was an implied agreement regarding compensation for sleep time even if Plaintiff has not signed an agreement expressly excluding it. Therefore, with respect to his FLSA and PMWA claims, Defendants' motion for summary judgment will be granted.

WPCL Claim

Defendants argue that Plaintiff cannot maintain a claim under the WPCL because it only provides a remedy to recover wages earned, and his agreement specifically excluded the sleep time for which he now seeks compensation. Plaintiff argues that this contention is unsupported. However, he acknowledges that his WPCL claim survives or fails depending upon his FLSA and PMWA claims.

The Pennsylvania Superior Court has held that, where a complaint alleges that certain wages may be owed under the PMWA (a statutory basis), a plaintiff may also enforce the right to those wages under the WPCL, even in the absence of a contract. Lugo v. Farmer's Pride, Inc., 967 A.2d 963, 969 (Pa. Super.), appeal denied, 980 A.2d 609 (Pa. 2009). Thus, Defendants' argument that the contractual provision excluding sleep time completely precludes a claim for such wages under the WPCL is rejected. See Hively v. Allis-Chalmers Energy, Inc., 2013 WL

2557629, at *2 (W.D. Pa. June 10, 2013) (Fischer, J.).

Nevertheless, as Plaintiff acknowledges, a claim under the WPCL depends upon whether his wages were "earned," which must be determined in the first instance in this case under the FLSA. Shannon, 82 F. Supp. 2d at 427 n.1. Because Plaintiff has failed to demonstrate a genuine issue of material fact as to whether he has "earned" the wages for his sleep time under the FLSA, he cannot recover such potential wages under the WPCL. Therefore, summary judgment will also be entered for Defendants on this claim.

For these reasons, the motion for summary judgment filed by Defendants will be granted. An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

GRANT GALLOWAY,                          )
                          Plaintiff,     )
                                         )
        vs                               )        Civil Action No. 12-1399
                                         )        Magistrate Judge Mitchell
GEORGE JUNIOR REPUBLIC and GEORGE        )
JUNIOR REPUBLIC IN PENNSYLVANIA,         )
                          Defendants.    )

<u>ORDER</u>

AND NOW, this19th day of September, 2013, for the reasons discussed above,

IT IS HEREBY ORDERED that the motion for summary judgment filed by

Defendants, George Junior Republic and George Junior Republic in Pennsylvania (ECF No. 34),

is granted.

s/Robert C. Mitchell
ROBERT C. MITCHELL
United States Magistrate Judge